### LAWLOR v. FRENCH.

(Supreme Court, Appellate Division, First Department. March 6, 1896.)

INJURIES FROM VICIOUS ANIMAL—NOTICE TO OWNER—EVIDENCE.

In an action for the death of plaintiff's intestate, caused by a kick from a horse, used by defendant on his theatrical stage, evidence that the horse at one time pressed a witness against another horse as he went into his manger, and that he, several months before the accident, when teased by those around him, snapped at them, and that or another occasion had kicked another man, is insufficient to prove that the manager of the theater had knowledge that the horse was vicious, so as to render the owner liable. Williams and O'Brien, JJ., dissenting.

Appeal from court of common pleas, trial term.

Action by Kate Lawlor, as administratrix, against Thomas H. French. From a judgment for plaintiff entered after the overruling of exceptions ordered to be heard at first instance at general term, and from an order denying a motion for a new trial on the ground that the verdict was excessive, and otherwise contrary to the law and evidence, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

D. B. Ogden, for appellant.

T. D. Semple, for respondent.

VAN BRUNT, P. J. This action was brought to recover damages for injuries which the plaintiff's intestate is alleged to have sustained by reason of the kick of a horse upon the stage of the American Theater in the city of New York, on the 11th of October, 1893, of which theater the defendant was the manager. Upon the trial of this action a verdict was rendered for the plaintiff, upon the coming in of which the defendant moved for a new trial, which was denied. The exceptions in the case were ordered to be heard in the first instance at the general term. These exceptions were overruled, and a judgment entered upon the verdict for the plaintiff. Thereafter an order was made upon the motion for new trial, and from such judgment and order this appeal is taken.

Whatever might have been our judgment upon some of the exceptions which are contained in the record, they are not before us for consideration, the same having been considered upon the motion for

new trial upon the exceptions directed to be heard in the first instance at the general term. The only question presented upon the appeal from this order is, was the verdict against the evidence? The claim upon the part of the plaintiff necessarily was that the horse which was employed upon the stage of the theater by the defendant was vicious, and was either known to the defendant to be vicious, or from the facts established upon the trial he should have known it. The evidence consists of the testimony of some persons who were employed upon the stage of the theater in question.

One Toner testified that on the 2d of October, 1893, he was on the right-hand side of the stage, and went to go to his manger, from which to take a blanket for a horse by the name of Bohemia; that this black cob horse (the horse in question) was right alongside of him, and he was between both horses, when he let drop the blanket, and the cob horse pushed over him, and he was crushed between both horses, and was afterwards taken to the hospital. The witness further stated that he could not tell what occurred that made the horse back or sidle up against him, because he could not see anybody passing on the opposite side, and he could not tell how he came to back up against him. The witness further testified that he saw the horse at the theater, and that his movements at times were lively; but he utterly fails to mention any viciousness whatever that he had observed upon the part of the horse.

The next witness was one Shevlin, who testified that he was valet for three of the leading gentlemen of the theater; that he saw the horse kick the deceased. He says:

"This man was putting up this screw-cye to hold that railing from coming down. These two horses came across, started to turn around, and this man was at his post at the time, and the horse let out with his foot, and kicked him right in the ribs. The man fell in a lump, and was carried right to the left of the stage."

He further testified in regard to the horse:

"I had seen that black cob horse there often. I had seen him snap and bite at people passing by. That was before the accident; ever since the horse came in the theater. I saw him make several attempts to bite people passing by at the time the Prodigal Daughter was going on. He was there all that piece. He was there, I think, three months before the accident.. During those three months I saw him snap and bite at people two or three times about a month and a half or two months or so before the accident."

The testimony of this witness evidently is solely to the effect that a month or so before the accident he had seen the horse two or three times snap or bite at people. But it does not appear that the horse was guilty of any other misconduct, so far as the witness saw, and he testified that he had seen him there often.

The next witness was a man named Knapp, who testified that he had been kicked by this horse in the latter part of September, 1893, and that on one occasion the horse bit him. Upon cross-examination he states that he was employed in Rogers' livery stable, at which place the horse in question was kept; that there were nine horses on the stage of an evening, two of them being race horses, and the others just hired horses, and all belonging to Rogers; and that he was employed in this way three months, until the piece was off. He says:

"I got my foot hurt ten days before he made a bite at me. When the horse kicked me, I was back there, and some of them had a stick there, and once or twice they hit this black horse, and made him vicious, and no one could get around him, and no one would go about back of him or in front of him because from jamming between them. I was walking along there on that side, and he came up with his foot, and kicked me there. He was there a few days, and he commenced to get vicious; people teasing him. When he kicked me there was nobody there. I guess he had been teased. The boys took sticks.—a few jockeys used always to have a stick,—and coming along there tickled him. Toner [the witness above mentioned] used to tickle them once in a while. He came along, and was in the habit of tickling the horse. Punching them with a stick, that would make them kick."

This evidence is far from showing that the horse was vicious, but, on the contrary, that he was goaded into the action which is alleged against his good temper.

One McGlory, a witness called on behalf of the defendant, testified that he had seen attendants and. supernumeraries around the stage strike the horse, previous to that night, at different times. Further evidence was given in regard to the disposition of the horse by those that had known him, and that he was not known to be vicious before he entered upon this employment.

It is apparent from this evidence that the horse was not vicious, but that whatever nervousness he displayed was the result of the teasing to which he had been subjected by the people engaged around him. Under such circumstances, the horse being apparently of a quiet disposition, goaded into the action described by the acts of those around him, and this manifesting itself only occasionally, and, it would seem, against those who had been amusing themselves at his expense, he certainly showed no such disposition as would call upon the manager of the theater to assume that he was vicious.

We have examined the large number of authorities which have been cited upon the part of the plaintiff, but we find no case that would sustain a verdict upon evidence such as is contained in the record in the case at bar. The case most favorable to the plaintiff, as being one upon which a verdict was sustained upon the lightest evidence, seems to be that of Turner v. Craighead (Sup.) 31 N. Y. Supp. 369, decided by the general term in the Second department, in which it was held that where a person keeping an animal upon his place omits to exercise ordinary supervision over it, lets it run, and fails to obtain the knowledge which such supervision would give, he is chargeable with the same knowledge that he would have obtained had he acquired and supervised in the ordinary and usual way. That action was brought to recover damages resulting from being bitten by a dog. The evidence was that the dog had bitten persons on two occasions prior to the attack made upon the plaintiff, and that it was his habit, as also that of two other dogs owned by the defendant, to rush out at persons passing upon the highway, and bark at them; that when any person passed along the highway the three dogs would all rush out after him; and that the dog in question was ugly, and would jump at horses' heads, and try and catch them by the snout. There was no evidence to show that the defendant knew of these occurrences, and the court submitted it to the jury to determine whether the defendant ought to have known that the dog was savage, and likely to bite,

charging them that if a person keeps an animal upon his place, and fails to exercise ordinary supervision over it, and lets it run, and fails to obtain the knowledge which ordinary supervision over it would give, he is chargeable with the same knowledge he would have obtained had he inquired and supervised in the ordinary and usual way. This ruling the court held to be correct. But the evidence in that case was different from that which is contained in the record in the present case. There the vicious disposition was established by evidence and its long continuance, in regard to some of which at least the owner must have had knowledge. Our attention is also called to the case of Hahnke v. Friederich, 140 N. Y. 224, 35 N. E. 487. That was also a case to recover for damages sustained from the bite of a dog. The testimony in that case showed that the defendant procured and kept the dog to guard his barn and the property therein, and that he considered it necessary to chain and muzzle him. The purpose for which he was kept, and the manner in which the owner was accustomed to restrain him, were circumstances which, with the other testimony in the case, authorized an inference by the jury of knowledge by the defendant of the vicious propensities of the animal. In the case of Muller v. McKesson, 73 N. Y. 195, which was another dog case, the rule was laid down that in an action against the owner of a ferocious dog or other animal, for injuries inflicted by it, the gravamen of the action is the keeping of the animal with knowledge of its propensities; and, as to the latter, proof that the animal is of a savage and ferocious nature is equivalent to express notice. So, in the other cases cited by the respondent, the same rule is laid down.

We have searched the record in this case in vain to find that there were any facts which called upon the defendant to know that the horse in question was of a vicious disposition. Indeed, there is no evidence that he was of a vicious disposition. Whatever temper he displayed seems, from the record, to have arisen from the fact that he was teased and struck and punched with sticks by those who were surrounding him. We are referred to no authority which, under such circumstances, implies notice of viciousness upon the part of the owner or user of any domestic animal. We think that there is no evidence tending to show that the defendant had any knowledge or reason to believe that the horse was vicious, or that the horse was in fact vicious. The defendant at once, when informed of the fact of his kicking the deceased, removed him from the theater.

The order denying the motion for new trial should be reversed, and the judgment set aside, and a new trial ordered, with costs to the appellant to abide the event.

INGRAHAM and PATTERSON, JJ., concur.

WILLIAMS and O'BRIEN, JJ. We dissent on the ground that there was evidence sufficient to present the case to the jury as one of fact as to whether or not the horse was vicious, and as to whether the defendant had notice thereof before the accident happened.